IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.                                          Criminal Action No. 2:22cr139

JONATHAN F. LONG,
　　　　　　　　Defendant.

## OPINION

This matter comes before the Court on a motion to dismiss the indictment, (ECF. No. 20), and on a motion to suppress evidence, (ECF No. 21), filed by the defendant, Jonathan Long.  On July 22, 2020, federal agents executed a valid search warrant of Long's home on the suspicion that he violated the Clean Air Act ("CAA").  The government later charged Long with criminal violations of the CAA.  Long moves to dismiss the indictment, arguing that his actions do not fall within the purview of 42 U.S.C. § 7413(c)(2)(C), the statutory provision under which the government has charged him.  Long also seeks to suppress statements he made during the search of his home on the basis that the agents subjected him to a custodial interrogation without reading him his *Miranda* rights.

The Court will deny Long's motion to dismiss the indictment, as a plain reading of the CAA permits the government to pursue felony criminal charges against Long under 42 U.S.C. § 7413(c)(2)(C). (ECF No. 20.)  But the Court will grant Long's motion to suppress statements he made to the agents during the interview in his home. (ECF No. 21.)  Because a reasonable person would not have felt that he could leave based on the circumstances surrounding the interrogation, Long was in custody and entitled to *Miranda* warnings when the agents questioned him.

# I. BACKGROUND

## A. Relevant Legal Background

Congress passed the CAA "to protect and enhance the quality of [the United States'] air resources." 42 U.S.C. § 7401(b)(1).  Subchapter I (Title I), "Programs and Activities," generally covers air quality, emissions limitations, and ozone protection.  *See generally id.* §§ 7401–7515. That includes, among other things, limitations on emissions from stationary sources.  Meanwhile, Subchapter II (Title II), "Emissions Standards for Moving Sources," generally governs emissions for vehicles, such as cars, tractors, and aircraft.  *See generally id.* §§ 7521–7590.  One provision, for example, directs the Environmental Protection Agency ("EPA") to establish emission standards for cars that aim to limit certain pollutants.  *See id.* § 7521(a).

Section 113 of the CAA, in Title I, establishes different mechanisms for the government to enforce the statute's provisions.  *See* 42 U.S.C. § 7413.  One such mechanism is criminal sanctions, which includes Section 113(c)(2)(C), the provision under which the government has charged Long. Under that provision, "[a]ny person who knowingly[] . . . falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under" the CAA "shall, upon conviction, be punished by a fine . . . or by imprisonment of not more than 2 years, or both."  42 U.S.C. § 7413(c)(2)(C).

In 1990, Congress added a provision in Subchapter II directing the EPA to issue regulations requiring "emissions control diagnostics" systems in new cars.  Clean Air Act Amendments of 1990, 104 Stat. 2472–2481, 2507, 2529, Pub. L. 101–549 (1990); *see also* 42 U.S.C. § 7521 (Section 202).  These diagnostic systems "identify[] . . . [the] deterioration or malfunction" of "emission-related systems," such as catalytic converters and oxygen sensors; collect information about any possible systems failure; and "alert[] the vehicle's owner" of any need for repair.  42

2

U.S.C. § 7521(m)(1) (Section 202(m)).  To comply with the statute, the EPA issued a regulation requiring "onboard diagnostic (OBD) system[s]" on certain cars from 2008 onward.[1]  40 C.F.R. § 86.1806-05.  In effect, the CAA amendment and accompanying regulation mandated the inclusion of the now well-known "check-engine light," along with its associated underlying OBD software, on all new cars.

### B.  Factual Background[2]

In 2020, the EPA began investigating Long on the suspicion that he was selling devices through his part-time business and providing his customers with technical assistance to "tune," or tamper with the OBD systems on, their diesel trucks.[3]  Based on this investigation, the government obtained a warrant to search Long's home, but not to arrest him.  Agents from the EPA's Criminal

---

[1] OBD systems "are self-diagnostic systems incorporated into" a vehicle's engine control module (ECM), which is a computer module that controls the engine functions. *OBD – On-Board Diagnostic Program*, Cal. Air Res. Bd., https://ww2.arb.ca.gov/our-work/programs/obd/about (last visited Oct. 31, 2024). "The OBD system monitors virtually every component that can affect the emission performance of the vehicle to ensure that the vehicle remains as clean as possible over its entire life." *Id.* "If a problem with an emissions-related component is detected, the OBD system illuminates" the check-engine light on the vehicle instrument panel. *Id.* For any significant and unresolved problems, the OBD system may enter limp mode, which reduces the power of the car, limits its top speed, and diminishes its performance. *What Is Limp Mode?*, AutoZone, https://www.autozone.com/diy/electrical/what-is-limp-mode (last visited Oct. 31, 2024).

[2] The Court held a hearing on Long's motion to dismiss and his motion to suppress on October 17, 2024.  The Court draws the facts below from the testimony and exhibits presented at the hearing and submitted with the parties' briefings.

[3] The exhaust pipe on a diesel truck contains hardware that manages and treats the exhaust by reducing pollutant levels.  Although one can remove that emissions-treatment hardware from a truck's exhaust system, doing so triggers the OBD system, including the check-engine light.  To solve that problem, one can "tune" the OBD software by using a "defeat device" that downloads software onto the OBD system and ECM.  The software effectively overrides the OBD system so that it stops detecting the missing hardware.  Because tuned diesel trucks lack the exhaust treatment and monitoring systems that the CAA requires, they can emit emissions that exceed CAA limits while otherwise appearing to function normally—without activating limp mode or the check-engine light.

Case 2:22-cr-00139-JAG-RJK   Document 44   Filed 11/07/24   Page 4 of 16 PageID# 265

Investigation Division ("CID") and the Naval Criminal Investigative Service ("NCIS") executed

the search warrant on July 22, 2020, at 6:00 a.m.  As several of the agents secured the perimeter

of Long's property, three or four others—including Special Agents William Stull and Daniel

Salek—approached Long's front door.  Long, who was fully dressed and preparing to leave for

work, answered.  With guns drawn, Agents Stull and Salek ordered Long and his wife out of their

home and told Long to place his hands on his head.  Long immediately complied.  The agents then

holstered their weapons, patted Long and his wife down, and confiscated their cell phones.

As other agents completed a protective sweep, Agent Stull and Long both entered the

home.  Around this time, Agent Stull told Long that he was not under arrest and that he was free

to leave to go to work.[4]  Long did not leave and proceeded to wander freely around his home,

including going upstairs without an agent at his side.

When Long came back downstairs, Agents Stull and Salek began interviewing him at his

dining room table.  The agents did not read Long his *Miranda* rights before starting, but they did

ask at the outset whether Long objected to them recording the interview.  In response, Long asked,

"Should I have a lawyer?"  The agents said that they could not advise him on whether he should

have a lawyer present and stressed that he should tell the truth.  Long replied, "I have nothing to

hide.  I'll tell you exactly what I sell.  I sell race products."  Long then asked for his phone, but the

agents told him that he could not have it because they had seized it pursuant to the search warrant.

This prompted Long to ask about the warrant's scope.  The agents explained that they were

investigating "potential violations of the Clean Air Act" and searching for items like defeat

---

[4] While no video or audio footage captures this statement, Agent Stull testified to this fact
at the suppression hearing.  On cross-examination, Agent Stull could not remember whether he
told Long that he would not be arrested at all that day.  But he maintained that he told Long early
in their interaction that he was not under arrest, and he never told Long that he was under arrest on
the day of the interview.

devices.[5] The agents then told Long that he could borrow one of their phones to contact an attorney, and that the NCIS agents could contact Long's Navy supervisor if he would like. After Long reviewed the warrant, Agent Stull stated that the interview was "more or less a formality" that "depend[ed] on how much [Long] want[ed] to cooperate," but that the decision to participate was "entirely" up to him. Long then agreed for the agents to record the interview. Agent Stull stood over Long throughout this entire exchange.

Agent Salek then gave Long another opportunity to call his Navy supervisor "to let him know" that Long was "not going to be [at work] today." Long agreed, and the agents retrieved Long's phone so he could make the call. Long told his supervisor that federal agents were executing a search warrant of his home, but that he would be in "as soon as they are done."

The agents then spent portions of the next two-and-a-half hours asking Long about his business. On at least five occasions, the agents stressed to Long that he should tell the truth. They asked him about his business and clients, the services he provided, and the software that he sold. Around 6:35 a.m., the agents asked Long where he stores his customers' contact information. When Long explained that he does not keep his customers' information, Agent Salek replied, "That's why we're taking the phone." Long immediately responded that he wanted "to contact a lawyer about that." Agent Salek asked, "You want to contact a lawyer right now?" Long replied, "Yes." The agents then asked Long to take them to his shed and paused the interview.

At 6:55 a.m., the officers resumed recording the interview, saying that Long had requested an attorney to discuss the contents of the search warrant, but that he otherwise "agreed to continue talking and answering questions" on the condition that he could "refuse to answer any questions

---

[5] A defeat device is a device "that bypasses, defeats, or renders inoperative a required element of [a] vehicle's emissions control system." Press Release, Env't Prot. Agency, Clean Air Act Prohibits "Defeat Devices" in Vehicles, Engines (Aug. 1998).

he wanted. At one point, Agent Salek asked Long where the ECM was located on his truck and indicated that he would remove it, which would disable the vehicle. But Agent Stull intervened, and the agents did not end up removing the ECM.

At several points after Long initially said that he wanted to talk to an attorney, he either talked about needing a lawyer or refused to answer questions. For example, when asked about whether his personal truck had any modifications, Long said, "I need to talk to my lawyer before I answer that." In response, Agent Salek opined that he was "not sure that law firms are open yet" but that Long was "welcome to try" calling. Later, the agents asked Long, "Do you want to try to reach out to a law firm?" Long replied, "No, you can keep going." But the agents decided to pause the recording and take a five-minute water break anyway. When Long's wife—who stood in a nearby room for much of the interview—finally reached a lawyer around 8:00 a.m., Agent Salek told Long, "If you'd like to take some time to talk to an attorney, please take as much time as you need." After Long did not answer, Agent Salek asked if Long wanted to continue. Long replied, "Go ahead, I have nothing to hide." As Long's wife spoke on the phone, the agents finished asking questions. They stopped recording at around 8:20 a.m.

## II. DISCUSSION

### A. *Motion to Dismiss*

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) permits a court to dismiss an indictment for failure to state an offense. An indictment may "fail to state an offense if 'the allegations therein, even if true, would not state an offense.'" *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023) (quoting *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004)). The government charges Long with six felony counts of knowingly tampering with, and causing others to tamper with, a monitoring device required by the CAA, in violation of 42 U.S.C. § 7413(c)(2)(C) and 18

U.S.C. § 2. Long disputes that he committed such an offense under the CAA and moves to dismiss the indictment on three overarching grounds. First, he asserts that the term "monitoring device," as used in Section 113(c)(2)(C), does not include an OBD system, and that the structure of the statute shows that its criminal prohibition on tampering with "monitoring device[s]" applies only to stationary sources of emissions anyway. Second, he argues that even if OBD systems qualify as "monitoring device[s]", the indictment alleges only that he sold defeat devices, and that selling defeat devices does not expose him to criminal penalties under Section 113. Third, Long invokes the rule of lenity to argue that he lacked notice of the EPA's criminal charging theory until after he allegedly sold the defeat devices.

### 1. Ordinary Meaning and Structure of the Law

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). This requires a court to "first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012) (quoting *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007)). A statute's plainness or ambiguity depends on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quoting *United States v. Thompson-Riviere*, 561 F.3d 345, 354–55 (4th Cir. 2009)). "Where[] . . . that examination yields a clear answer, judges must stop." *Food Mktg. Inst.*, 588 U.S. at 436.

At least one district court has evaluated the precise question Long raises here: whether an OBD system qualifies as a "monitoring device" under Section 113(c)(2)(C). *See United States v. Coiteaux*, No. CR21-5184 BHS, 2024 WL 1998417, at *3 (W.D. Wash. May 6, 2024). In *Coiteaux*, the defendant argued that an OBD system helps detect and diagnose emissions problems,

7

but does not monitor emissions. *Id.* In rejecting that argument, the district court noted that a functioning OBD system "perform[s] the special function to watch, keep track of, or check [a] vehicle's emission systems," which aligned with the dictionary definition of "monitoring device." *Id.* (internal quotation marks and citation omitted). It accordingly held that an OBD system qualifies as a "monitoring device" under the CAA. *Id.*

The Court reaches the same conclusion here. Nothing in the text of Section 113(c)(2)(C) suggests that the statute applies only to devices that monitor emissions. On the contrary, the statute covers "*any* monitoring device or method" that the CAA requires. 42 U.S.C. § 7413(c)(2)(C) (emphasis added). And another provision of the CAA effectively mandates OBD systems by directing the EPA to promulgate regulations requiring "emissions control diagnostics systems" in cars. *Id.* § 7521(m)(1) (Section 202(m)). Because OBD systems monitor the functionality of other emissions systems, they qualify as "monitoring device[s]" under Section 113(c)(2)(C).

Long nevertheless attempts to sidestep the statute's plain language in two ways. First, he contends that Subchapter I—which contains Section 113—applies only to stationary sources, not to mobile sources like cars. But several provisions of Subchapter I expressly address mobile, rather than just stationary, sources. *See, e.g.*, 42 U.S.C. § 7401(a)(2) (noting Congress's finding that "the increasing use of motor vehicles," among other factors, "has resulted in mounting dangers to the public health and welfare"); *id.* § 7404 (establishing standards for fuel and vehicle research). In any event, Section 113(c)(2)(C) explicitly applies to any monitoring device "required to be maintained or followed under this chapter"—that is, the CAA. By its plain terms, then, Section 113 applies to the entire CAA, not just Subchapter I's provisions about stationary sources.

Second, Long asserts that the EPA delegated its regulatory authority to OBD systems to the California Air Resources Board ("CARB"), a California state regulatory agency, in 1996, and

that California regulations permit one to sell a car without all the required OBD sensors so long as

he pays a civil fine. Long accordingly argues that Section 113's prohibition on failing to install a

monitoring device conflicts with CARB's regulation permitting waiver of installing an OBD

system at the expense of a civil fine. But CARB's regulations do not frustrate the plain meaning

of the CAA. The CAA allows the EPA Administrator to waive the CAA's preemption provision

for certain states that have "adopted standards . . . for the control of emissions from new motor

vehicles" if those standards are, "in the aggregate, at least as protective of public health and welfare

as applicable Federal standards." 42 U.S.C. § 7543(b). The EPA issued such a waiver for

California, and CARB issued its non-compliance-waiver regulation pursuant to that preemption

waiver. *See* 61 Fed. Reg. 53,371 (Oct. 11, 1996) (EPA's preemption waiver for California).

Consistent with the CAA, the EPA has incorporated the CARB waiver (and other CARB

regulations) into its OBD regulatory framework. *See* 40 C.F.R. § 86.1806-05 (discussing Cal.

Code Regs. tit. 13, § 1968.2, and explaining that "[m]anufacturers may comply with California's

OBD requirements instead of meeting the requirements of this section"); *see also* 42 U.S.C.

§ 7521(m)(1) (Section 202(m)) (directing the EPA to issue regulations requiring OBD systems).

Thus, the two regulatory regimes generally complement, rather than contradict, each other.[6]

     In short, Section 113(c)(2)(C) applies to the entire CAA, and the CARB regulations work

in sync with the statute here. Thus, Long's structural arguments cannot overcome the plain and

ordinary meaning of the CAA.

---

[6] Even if the Court accepted that the two regulatory schemes clash in the limited instance where one fails to install an OBD system, that conflict would not implicate Long's case, as the government accuses him of tampering with an OBD system, not failing to install one.

## 2. *Effect of Civil Enforcement Provisions*

Long next contends that the indictment alleges that he sold defeat devices, rather than used them. This distinction matters, he says, because the Court must read Section 113 consistent with the civil enforcement provisions of Section 203 of the CAA. Section 203 establishes civil liability for certain types of interference with motor-vehicle emissions systems. Under Subsection (A), a person can receive a $25,000 civil penalty if they "remove or render inoperative any device or element of design installed on a motor vehicle." 42 U.S.C. § 7522(a)(3)(A); *id.* § 7524(a) (penalty). And under Subsection (B), a person can receive a civil penalty of no more than $2,500 if they "manufacture or sell, or offer to sell, or install, any part or component" that has the "principal effect" of "bypass[ing], defeat[ing], or render[ing] inoperative any device or element of design installed on or in a motor vehicle." *Id.* § 7522(a)(3)(B); *id.* § 7542(a) (penalty). According to Long, these civil liability provisions and their penalties show that "Congress clearly drew a line between *directly* tampering with [a] car's emissions control system and *selling equipment* that can be used to tamper with a car's emissions control system. (ECF No. 22, at 19.) And "[b]y bringing criminal tampering charges for the alleged distribution and sale of defeat devices, instead of pursuing civil enforcement . . . , the government has ignored the [CAA's] distinction between the two types of conduct and thus ignored the more specific defeat device prohibition." (*Id.* at 20.)

Contrary to Long's argument, the indictment alleges not only that he sold defeat devices, but also that he caused his customers to tamper with their OBD systems by "providing instructions on how to download and install the tunes." (ECF No. 1, at 4.) Notwithstanding that point, Congress often establishes parallel civil and criminal enforcement mechanisms, just as it did in the CAA. *See, e.g.*, *S.E.C. v. Dresser Indus., Inc.*, 628 F.2d 1368, 1374–75 (D.C. Cir. 1980) (describing the "unobjectionable" history of "parallel civil and criminal proceedings"); *United*

10

*States v. Rund*, No. 1:23-cv-00549, 2024 WL 3690774, at *8 (E.D. Va. Aug. 6, 2024) (describing "the parallel civil and criminal" penalties for committing certain tax reporting violations). And the government can pursue enforcement through either avenue or both. *See Dresser Indus.*, 628 F.2d at 1374; *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to the agency's absolute discretion."). The same principle applies to the CAA, as nothing in the statute "give[s] any indication that . . . one particular enforcement strategy must be used over another." *Assoc. of Irritated Residents v. EPA*, 494 F.3d 1027, 1033 (D.C. Cir. 2007). Thus, the government can pursue its case against Long civilly, criminally, or both.

Long further asserts that the government's interpretation of Section 113 leads to the "absurd result" of criminalizing the removal of OBD systems while imposing just a civil penalty for removing the corresponding emissions control hardware. (ECF No. 22, at 12.) "In assessing whether a plain reading of a statute implicates the absurdity exception, . . . the issue is not whether the result would be 'unreasonable,' or even 'quite unreasonable.'" *In re Sunterra Corp.*, 361 F.3d 257, 268 (4th Cir. 2004). Instead, the absurdity canon applies only where "literal application of the statutory language at issue results in an outcome that can truly be characterized as absurd" or "demonstrably at odds with clearly expressed congressional intent." *Id.* at 265 (quoting *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001)). Here, the legislative history does not shed light on why Congress chose to make tampering with emissions control hardware only a civil offense. But in imposing criminal liability for "knowing alterations of monitoring devices," Congress explained that "[s]uch liability is especially important" because the "EPA's ability to oversee the regulated community" depends largely "upon compliance by each source with reporting, record-keeping, and monitoring requirements." S. Rep. No. 101-228, at 226 (1990). Given this legislative history

11

and the plain language of Section 113(c)(2)(C), the absurdity exception cannot apply. Thus, the CAA's civil enforcement provisions do not dictate dismissal of the government's indictment.

### 3. *Fair Notice and the Rule of Lenity*

Relying on the rule of lenity, Long lastly contends that he had no notice of the government's "novel criminal charging theory" until late 2020, after he had already sold the defeat devices. (ECF No. 22, at 3.) The rule of lenity is "a rule of statutory construction, that provides that when ambiguity is present in criminal statutes, that ambiguity 'must be resolved in favor of lenity for the accused.'" *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (quoting *United States v. Sheek*, 990 F.2d 150, 153 (4th Cir. 1993)). When a statute is not "genuinely ambiguous," the rule of lenity has "no role . . . to play." *Pulsifer v. United States*, 601 U.S. 124, 152–53 (2024). Because Section 113(c)(2)(C) has no genuine ambiguity, *see supra* Section II.A.1, the rule of lenity does not apply.

*       *       *

Because (1) OBD systems qualify as monitoring devices under Section 113(c)(2)(C), (2) the CAA's civil enforcement provisions do not proscribe the government from charging Long criminally, and (3) the rule of lenity does not apply, the Court will not dismiss the indictment.

### B. *Motion to Suppress*

To "safeguard" a person's Fifth Amendment right against self-incrimination, police must "inform individuals who are in custody of their Fifth Amendment rights prior to interrogation." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013). "Absent formal arrest, *Miranda* warnings only apply 'where there has been such a restriction on a person's freedom as to render him in custody.'" *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)) (internal quotation marks omitted). "An

individual is in custody for *Miranda* purposes when, under the totality of the circumstances, 'a suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

Long analogizes his case to *United States v. Hashime*, 734 F.3d 278, 280 (4th Cir. 2013). There, "15-30 state and federal law-enforcement agents equipped with a battering ram" executed a search warrant at Hashime's home. *Id.* at 280. Hashime's aunt let them in, and they "streamed into the house with their guns drawn." *Id.* The officers pointed their guns at Hashime and pulled him out of bed. *See id.* They eventually put the rest of his family in the living room while they moved Hashime to a storage room in the basement. *See id.* at 280–81. As the interview began, the agents "told Hashime that he did not have to answer their questions and could leave at any time." *Id.* at 281. But throughout the interview, the agents insisted that Hashime tell the truth, refused to let him remain by himself, and told his family that "they could not see him or otherwise interrupt the interrogation." The agents did not read Hashime his *Miranda* rights until two hours into the interrogation. *Id.*

Based on the totality of these factors, the Fourth Circuit held that Hashime was in custody during the interrogation. *See id.* at 285. Although the agents had told Hashime that he was free to leave, the surrounding circumstances otherwise showed that he was in custody. This included the agents pulling Hashime out of bed at gunpoint, occupying his home, restricting his and his family's movements, and isolating him in the basement. *See id.* at 284. The Fourth Circuit also noted that interrogating Hashime in the family home cut in favor of a finding of custody in his case, as "[a] suspect 'may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.'" *Id.* (quoting *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008)).

13

The government rebuts Long's argument by pointing to *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010). In *Hargrove*, ten to fifteen officers executed a search warrant at Hargrove's home. *See id.* at 173–74. The officers drew their guns, "directed the occupant's actions during the initial safety sweep of the residence, and conducted a safety pat down of Hargrove." *Id.* at 179. Two agents then brought Hargrove to his kitchen, where one interviewed him in an "amicable and non-threatening" tone as the other stood in a doorway.[7] *Id.* at 179–80. Neither of the agents drew their guns during the interview, nor did they handcuff Hargrove. *See id.* at 179. One of the agents also told Hargrove from the outset that he was not under arrest and that he was free to leave at any time. *Id.* at 182.

Long's case appears to align more closely with *Hargrove* than *Hashime* at the start. Although the agents executed the search early in the morning, Long was fully dressed and preparing to leave for work when the agents knocked on his door. Once Long answered, Agent Stull temporarily detained Long by drawing his gun, which Agent Stull "had authority" to do "to secure the site for conducting a search warrant." *Id.* at 179. Thereafter, Agent Stull holstered his gun, told Long that he was not under arrest and was free to leave, and permitted Long to freely roam his home for several minutes.

Circumstances shifted, however, once Agents Stull and Salek began interviewing Long in his dining room. To be sure, numerous similarities to *Hargrove* remained. For example, the agents never handcuffed or drew their guns on Long. They also told Long that his decision to participate in the interview was "entirely" up to him, generally spoke in a measured tone, permitted Long to get water, did not isolate Long from his wife, and allowed his wife to interrupt the interview at

---

[7] The parties disputed whether the agents allowed Hargrove to freely move around and smoke cigarettes during the interview. *See id.* at 174–75.

14

times as she tried to contact a lawyer.  But in contrast to *Hargrove*, Agent Stull did not merely

stand in the doorway when he obtained permission to record the interview.  Instead, he stood over

Long until Long agreed to a recorded interview, while other agents occupied and searched the

home.  From there, Agent Salek asked Long whether he wanted to call his supervisor to tell him

that he would not make it into work that day, giving the impression that Long could not, in fact,

leave.  Long's own words confirm this understanding, as he told his supervisor that he would come

in to work only once the agents finished their search.  In these circumstances, Long—or any

reasonable person—would not feel as if he could "empty his home of his interrogators until they

. . . completed their search." *Hashime*, 734 F.3d at 284 (quoting *Craighead*, 539 F.3d at 1083).

Thus, while this case presents a close question, Long appears to have entered custody at this point.[8]

The Court accordingly holds that any statements he made thereafter are inadmissible.[9]

## IV. CONCLUSION

For the reasons set forth above and as stated from the bench, the Court denies Long's

motion to dismiss the indictment, (ECF No. 20), but grants his motion to suppress evidence, (ECF

No. 21).

The Court will issue an appropriate Order.

---

[8] Other factors further support the Court's finding that "coercive pressures existed" throughout Long's interrogation. *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (emphasis removed).  For example, Agent Salek threatened to disable Long's truck, which would have prevented Long from leaving to go to work.  And while the agents permitted Long to call attorneys, they conducted the interview well before normal business hours and made sure to remind him that any attorney would likely not be available at that time of day.

[9] Long also faults the government for continuing to question him after he invoked his right to counsel by stating, "I want to contact a lawyer about that."  According to Long, any statements he made thereafter are inadmissible under *Edwards v. Arizona*, 451 U.S. 477 (1981). But *Edwards* concerns the invocation of one's right to counsel only after receiving *Miranda* warnings. *See Maryland v. Shatzer*, 559 U.S. 98, 104–05 (2010).  Because Long never received *Miranda* warnings, his case does not implicate *Edwards*.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 7 November 2024
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

16